# Syllabus

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kimberly K. Muschong

## PEOPLE v SORIANO

Docket No. 167373. Argued on application for leave to appeal December 10, 2025. Decided July 7, 2026.

Zebadiah J. Soriano was convicted following a jury trial in the Grand Traverse Circuit Court of assault with intent to commit criminal sexual conduct (CSC) involving penetration, MCL 750.520g(1). Defendant and his friend, AC, took LSD together at the home AC shared with her mother. At some point after ingesting the LSD, defendant removed his pants and underwear, forced himself on top of AC, and began to grope her. AC testified that before the assault, defendant said, "We're going to do this," and "we're going to do this, right?" AC was able to get away from defendant and go to her mother for help. Defendant eventually left the house while still naked from the waist down, and AC's mother called the police. After officers found defendant, he was arrested and taken to the hospital. The sheriff's deputy who arrested defendant and was with him at the hospital observed that, when he first encountered him, defendant seemed to be hallucinating, and he was confused at the hospital while "coming down" from the effects of the drug. The deputy read defendant his *Miranda*[1] rights about an hour after he was found by the police. According to the deputy, defendant waived his rights and agreed to speak to the deputy. During the interrogation, defendant stated, "I am a rapist and I am fucked."

The trial court, Kevin A. Elsenheimer, J., denied defendant's pretrial motion to suppress the statements elicited following his waiver. Following his conviction, defendant moved for a new trial or, in the alternative, an evidentiary hearing on his claim that his trial counsel was ineffective for failing to secure an expert witness on intoxication. The trial court denied the motions. Defendant appealed, and the Court of Appeals, SWARTZLE, P.J., and SERVITTO, J. (GARRETT, J., concurring in part and dissenting in part), affirmed in an unpublished, per curiam opinion, issued May 30, 2024 (Docket No. 359165). Defendant applied for leave to appeal in the Supreme Court, and in lieu of granting leave, the Court ordered oral argument on the application. ___ Mich ___; 20 NW3d 594 (2025).

In an opinion by Justice THOMAS, joined by Chief Justice CAVANAGH and Justices ZAHRA, WELCH, BOLDEN, and HOOD, the Supreme Court *held*:

---

[1] *Miranda v Arizona*, 384 US 436 (1966).

Defendant's *Miranda* waiver was not valid because it was not knowing and intelligent. The admission of the statements he made under the invalid waiver was not harmless error because the statements were highly prejudicial in demonstrating defendant's intent to commit a sexual penetration at the time of the assault. Therefore, defendant was entitled to a new trial.

1. Defendant's waiver was not knowing and intelligent. Courts are to consider the totality of the circumstances present at the time of the alleged waiver, which requires consideration of all the circumstances surrounding the interrogation, including the suspect's age, experience, education, background, and intelligence, and whether the suspect has the capacity to understand the *Miranda* warnings, their Fifth Amendment rights, and the consequences of waiving those rights. Additionally, because of the impact that intoxication may have on a person's mental state, special care must be taken in assessing a waiver when there is evidence that the defendant was under the influence of alcohol or drugs.

Defendant had been hospitalized and displayed erratic and confused behavior before and during the questioning by police. The parties agreed that defendant had taken a large amount of LSD prior to the interrogation and was suffering from severe hallucinations prior to and at the time he was taken into police custody. Although defendant was no longer hallucinating when he was read the *Miranda* warnings about one hour after being taken into custody, the question was not whether he was hallucinating but whether he had the mental capacity to understand his rights and the import of waiving those rights when he was given the warnings. The short period of time between defendant's erratic behaviors and being advised of his *Miranda* rights supports the conclusion that defendant was not able to understand his rights at the time of waiver. The officer who questioned defendant testified that defendant seemed "confused" during the questioning, and defendant testified that he did not know why he was Mirandized and did not understand the interrogating officer's questions. Although defendant's admitted statements evidenced that he had some understanding that he was in trouble, this did not equate to an understanding of his *Miranda* rights and making a knowing and intelligent waiver of those rights. Defendant did not satisfy many of the considerations that would indicate he had the ability to exercise discretion and the competence to understand his rights. Defendant's age, lack of experience with law enforcement, and lack of sleep contributed to the determination that he did not make a knowing and intelligent waiver. Accordingly, the prosecution did not establish that defendant's waiver was knowing and intelligent by a preponderance of the evidence, and the alleged waiver was invalid.

2. The prosecution did not demonstrate that the erroneous admission of the challenged statements was harmless beyond a reasonable doubt. The Court of Appeals concluded that any *Miranda* error was harmless because AC's testimony provided more than sufficient evidence for a reasonable jury to have found defendant guilty, given that a victim's testimony can be sufficient by itself to support a CSC conviction. However, the Court of Appeals erred in its harmless-error analysis. A preserved error is not harmless simply because the reviewing court concludes that the jury reached the right result. The question is whether an average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony. That is, the prosecution must prove that there is no reasonable possibility that the evidence complained of might have contributed to the conviction.

Assault with intent to commit CSC involving sexual penetration is a specific intent crime that requires the defendant to possess a particular criminal intent beyond the act. The prosecution was required to prove that defendant committed an assault and that he had an intent to commit CSC involving sexual penetration. The evidence supporting the intent element was: (1) defendant's removal of his pants and underwear, (2) AC's testimony, and (3) defendant's declaration, "I am a rapist." This statement overshadowed the other two pieces of evidence and was tantamount to an admission that he intended to commit a penetration. The statement was highly prejudicial to the defense and the strongest evidence that he intended to commit CSC involving penetration. Given the other evidence concerning defendant's intent, the average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted statement.

Court of Appeals judgment reversed, conviction vacated, and case remanded to the trial court for further proceedings.

Justice BERNSTEIN, concurring in part and dissenting in part, concurred with the majority that defendant's waiver of his *Miranda* rights was invalid and that admission of the statements was not harmless, but disagreed that the waiver was invalid because it was not knowing and intelligent. Instead, defendant's waiver was invalid because it was involuntary. The knowing-and-intelligent inquiry was governed by *People v Daoud*, 462 Mich 621 (2000), which held that the defendant in that case had made a knowing and intelligent waiver because he had the base intellectual capability of understanding his rights and an intellectual understanding of his rights, despite expert testimony that his delusions had prevented him from understanding how his *Miranda* rights applied to his situation. The majority did not meaningfully engage with *Daoud*, and it was difficult to reconcile the majority's holding with *Daoud*'s holding that only a baseline understanding of *Miranda* rights is required. The voluntariness test asks whether, considering the totality of the circumstances, the statement is the product of a free and unconstrained choice or whether the accused's will has been overborne and their capacity for self-determination critically impaired. Unlike the knowing-and-intelligent inquiry, a determination that a confession was involuntary requires that there was coercion. The police conduct here could be characterized as coercive, and an examination of the totality of the circumstances led to the conclusion that this coercion rendered defendant's waiver involuntary.

# OPINION

Chief Justice:
Megan K. Cavanagh

Justices:
Brian K. Zahra
Richard H. Bernstein
Elizabeth M. Welch
Kyra H. Bolden
Kimberly A. Thomas
Noah P. Hood

FILED July 7, 2026

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellee,

v

                                                    No. 167373

ZEBADIAH JOSEPH SORIANO,

     Defendant-Appellant.

 

BEFORE THE ENTIRE BENCH

THOMAS, J.

A jury convicted defendant, Zebadiah Soriano, of assault with intent to commit criminal sexual conduct (CSC) involving sexual penetration. See MCL 750.520g(1). At trial, the prosecution introduced testimony that Soriano declared himself "a rapist" when being questioned by a sheriff's deputy at the hospital. He claims that the statement should have been excluded because he did not provide a voluntary, knowing, and intelligent waiver of his rights before the deputy questioned him as required by *Miranda v Arizona*,

384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). In arguing that his waiver was invalid, Soriano relies on his hospitalization, his recent hallucinations and incoherence caused by LSD intoxication, his behavior during the deputy's questioning, and other circumstances as discussed herein.

We agree that Soriano's waiver was invalid. Voluntary intoxication does not make a *Miranda* waiver per se invalid. It is one factor within the totality of the circumstances courts should consider in assessing whether a waiver is knowing, intelligent, and voluntary. See *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000). However, the totality of the circumstances here undermined Soriano's ability to make a knowing and intelligent waiver. Moreover, the prosecution could not prove beyond a reasonable doubt that the statement at issue was harmless; the statement was the most significant evidence toward proving the intent requirement of MCL 750.520g(1). Accordingly, we reverse the judgment of the Court of Appeals, vacate Soriano's conviction, and remand to the trial court for further proceedings consistent with this opinion.

## I. FACTS & PROCEDURAL HISTORY

In the early morning hours of November 21, 2020, Soriano, who was 18 years old at the time, was with his platonic friend, AC, at her home, where he allegedly assaulted her. AC and Soriano had spent the day together on November 20, 2020, and Soriano returned with AC to the home she shared with her mother that night. AC and her mother had agreed to let Soriano stay with them to quarantine for two weeks after Soriano and AC were both exposed to COVID-19. AC's mother eventually went to sleep. Around midnight, AC and Soriano decided to take LSD. AC took one tab of LSD, and Soriano

2

took six tabs. Soriano testified that his dose was the most he had ever taken and more than double his normal dose.

Some time after the two had taken the LSD, Soriano took off his socks, pants, and underwear. AC testified that Soriano stated, "We're going to do this," and "[W]e're going to do this, right?" before forcing himself on top of her and groping her. AC testified that she resisted and was able to get away, but Soriano chased her to the stairs and began choking her with his arm. She got away again and ran up the stairs. AC's mother testified that she woke up and observed Soriano running up the stairs yelling, "I'm dead," and "We're all dead." AC's mother "reassured him that he wasn't" dead, at which point Soriano fell down the stairs. Soriano got up and fled into the cold fall night completely "naked from the waist down." AC's mother described Soriano as "agitated and aggressive" and "making incoherent statements." She briefly went to look for him, without success, and then called the police.

At approximately 4:00 a.m., deputies from the Grand Traverse County Sheriff's Office responded to a 911 call from the home. The caller relayed that Soriano had taken LSD and was hallucinating. Deputies began searching for him. After Soriano had wandered around outside for about an hour and a half, one of the deputies discovered him on the side of the road at 5:30 a.m. At that point, Deputy Mike Ruggles made his way to Soriano's location.

Soriano was still naked from the waist down when Ruggles arrived. Ruggles testified that Soriano "was definitely experiencing some sort of hallucinations and clearly under the influence of some sort of drug" when Ruggles encountered him. Ruggles arrested Soriano. While in custody, Soriano kept "saying things that didn't make sense and had

3

very erratic behavior." Ruggles put Soriano in the back of his car and took him to Munson Medical Center. Ruggles did not conduct an interview with Soriano immediately after the arrest because "[i]t was not possible at that time."

At the hospital, staff placed Soriano in a "restraint chair" for the safety of himself and others. Soriano's "erratic" behavior continued for a time before he slowly became still and silent. Soriano later testified that he had eventually figured out that he was at the hospital, being treated by doctors and nurses and in the company of a law enforcement officer, but he was not sure why at the time. Soriano recalled that although he was no longer hallucinating, things appeared "wavy" and time was "still moving at a weird pace." Likewise, Ruggles observed that Soriano was "confused after coming down from [the] euphoria he was experiencing." About an hour after he had been found by police, Soriano asked Ruggles why he was in the hospital.

At that point, Ruggles informed Soriano of the charges against him and read Soriano his rights as required by *Miranda*, 384 US 436. Ruggles testified that Soriano waived his rights and agreed to speak to him. Ruggles, however, could not recall what Soriano had said to indicate his *Miranda* waiver. There was no written *Miranda* waiver. Ruggles did not speak to hospital personnel or consult any medical information to conclude that Soriano was in a state to speak with him, instead relying on his own observations of Soriano's demeanor and perceptions of Soriano's understanding. After the alleged waiver, Ruggles proceeded to question Soriano.

During the 5- to 10-minute interrogation, Ruggles had to explain more than once why Soriano was at the hospital and asked Soriano "specific questions" because Soriano did not provide "much dialog." Rather, there were "many long pauses" in Soriano's

4

statements, and he "responded with a lot of yes-and-no" answers. Early in the questioning, Soriano also stated, "I am a rapist and I am fucked." Ruggles described this statement as coming "out of the blue." When asked by Ruggles, Soriano recalled taking six tabs of LSD that night. Soriano also responded to questions about his relationship with AC and answered various other questions posed by the deputy. The interrogation was not recorded on video.

Soriano's stepfather testified that he tried to speak with Soriano two hours after the interrogation and before Soriano was taken to jail, but Ruggles told him that "it wouldn't do any good" because Soriano was "too out of it." Ruggles acknowledged the conversation but testified that he did not remember what he told Soriano's parents. Soriano was discharged from the hospital and taken to jail at 8:37 a.m., shortly after the conversation between Soriano's parents and Ruggles. The next day, while still at the jail, police attempted to receive a waiver of *Miranda* and question Soriano again, and Soriano invoked his right to remain silent.

Soriano was charged with assault with intent to commit CSC involving sexual penetration, MCL 750.520g(1), and assault by strangulation, MCL 750.84(1)(b). Soriano moved to exclude the statements made at the hospital on the grounds that the waiver of his *Miranda* rights was not knowingly and voluntarily made. The trial court conducted an evidentiary hearing. In addition to the above facts, Soriano testified about his understanding of this questioning. Soriano claimed that at the beginning of the interrogation, he did not understand why Ruggles was giving him the *Miranda* warning. He "[k]ind of" understood what Ruggles was saying, "but not really." Rather, he "wasn't sure about" some of the questions and was "answering [them] randomly." According to

5

Soriano, he "was kind of in [his] own world" and remembered only portions of the preceding events. However, he agreed that some of the information he told Ruggles was correct, including that he had taken six tabs of LSD. The trial court denied defendant's motion to suppress and the case proceeded to trial.

Both Soriano and AC testified at trial, along with AC's mother and Ruggles. Ruggles's testimony included a recounting of Soriano's inculpatory statement from the hospital. The jury convicted Soriano of assault with intent to commit CSC involving penetration but acquitted him of assault by strangulation. Soriano moved for a new trial or, in the alternative, an evidentiary hearing on his claim of ineffective assistance of counsel, which was denied. See *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973). Soriano then appealed by right in the Court of Appeals, which affirmed. See *People v Soriano*, unpublished per curiam opinion of the Court of Appeals, issued May 30, 2024 (Docket No. 359165), p 1.

Soriano then sought leave to appeal in this Court. In lieu of granting leave, we heard oral argument on the application, directing the parties to brief:

> (1) whether the trial court clearly erred when it found that the defendant made a knowing, voluntary, and intelligent waiver of his rights under *Miranda v Arizona*, 384 US 436 (1966); (2) whether the trial court abused its discretion when it denied the defendant's motion to suppress, see *People v Cipriano*, 431 Mich 315, 333-334[; 429 NW2d 781] (1988); and (3) whether trial counsel was ineffective in failing to obtain an expert to address the defendant's level of intoxication while in the hospital. [*People v Soriano*, ___ Mich ___, ___; 20 NW3d 594, 595 (2025).]

## II. STANDARD OF REVIEW

This appeal challenges the trial court's denial of Soriano's motion to suppress. We review the trial court's factual findings on the motion for clear error. *People v Attebury*,

6

463 Mich 662, 668; 624 NW2d 912 (2001). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002). We review legal questions and the application of constitutional standards to uncontested facts de novo. *Attebury*, 463 Mich at 668.

## III. LEGAL BACKGROUND

The Fifth Amendment of the United States Constitution protects criminal defendants from coerced self-incrimination. US Const, Am V.[1] In furtherance of this protection, police are required to give suspects notice of their rights prior to a custodial interrogation "to protect against [its] inherently coercive nature." *People v Cheatham*, 453 Mich 1, 10-11; 551 NW2d 355 (1996) (opinion by BOYLE, J.). A suspect's rights include "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 US at 479. These rights are to be "scrupulously honored" by law enforcement. *Id*.

The United States Supreme Court has also recognized that people in custody "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*. at 444; see also *Daoud*, 462 Mich at 633. "[T]he prosecution has the

---

[1] Though Soriano also argues that his waiver was invalid under Article 1, § 17 of the 1963 Michigan Constitution, we do not find it necessary to reach the application of our state Constitution as a result of our decision herein.

burden of establishing a valid waiver by a preponderance of the evidence." *Daoud*, 462

Mich at 634. We have framed the waiver inquiry as a two-part analysis:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." [*Daoud*, 462 Mich at 633, quoting *Moran v Burbine*, 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986).]

These are the "voluntary" and "knowing and intelligent" inquiries, respectively. While

related, the concepts are analytically distinct in important respects and have different

focuses. We note that, for the "voluntary" inquiry, we and other courts have used the same

framework for assessing voluntariness in the *Miranda* waiver context that we use to

determine whether a confession was involuntary under a Fourteenth Amendment due-

process inquiry. *Cheatham*, 453 Mich at 17 (opinion by BOYLE, J.). Under both inquiries,

a defendant's " 'mental condition is surely relevant to an individual's susceptibility to

police coercion.' " *Id*., quoting *Colorado v Connelly*, 479 US 157, 165; 107 S Ct 515; 93

L Ed 2d 473 (1986).[2] We make no ruling regarding whether Soriano's waiver was

voluntary.

Rather, the focus of this case is largely on the "knowing and intelligent" inquiry.

This component "requires an inquiry into the suspect's level of understanding, irrespective

---

[2] See also, e.g., *Mincey v Arizona*, 437 US 385, 398-399; 98 S Ct 2408; 57 L Ed 2d 290 (1978) (considering involuntary intoxication, confusion, physical injury, and prior refusals to answer questions); *Beecher v Alabama*, 408 US 234; 92 S Ct 2282; 33 L Ed 2d 317 (1972) (considering involuntary intoxication, physical condition, and pressure from a medical provider to cooperate).

of police behavior." *Daoud*, 462 Mich at 636. This inquiry requires us to consider, broadly, " 'the state of mind of a criminal defendant . . . divorced from any coercion brought to bear on the defendant by the State.' " *Id*. at 637, quoting *Cheatham*, 453 Mich at 21-22 (opinion by BOYLE, J.). The question is not whether the defendant's decision to waive their *Miranda* rights was a wise one. *Daoud*, 462 Mich at 636, citing *Cheatham*, 453 Mich at 28 (opinion by BOYLE, J.). Instead, the focus is on the defendant's "basic understanding" of their rights. *Daoud*, 462 Mich at 642.[3] Accordingly, the required analysis focuses on whether the defendant " 'has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *Cheatham*, 453 Mich at 27 (opinion by BOYLE, J.), quoting *Fare v Michael C*, 442 US at 707, 725; 99 S Ct 2560; 61 L Ed 2d 197 (1979).

In considering whether a *Miranda* waiver is valid, courts are to consider the " 'totality of the circumstances' " presented in each case. *Daoud*, 462 Mich at 633-634, quoting *Moran*, 475 US at 421. This requires a look at " 'all the circumstances surrounding the interrogation,' " including the suspect's " 'age, experience, education, background, and intelligence,' " and consideration of " 'whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of

---

[3] See also *Cheatham*, 453 Mich at 28 (opinion by BOYLE, J.) (" 'It is not in the sense of shrewdness that *Miranda* speaks of "intelligent" waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation.' "), quoting *Collins v Brierly*, 492 F2d 735, 738-739 (CA 3, 1974); *Fare v Michael C*, 442 US 707, 724; 99 S Ct 2560; 61 L Ed 2d 197 (1979) ("[T]he question whether the accused waived his rights 'is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.' "), quoting *North Carolina v Butler*, 441 US 369, 373; 99 S Ct 1755; 60 L Ed 2d 286 (1979).

waiving those rights.' " *Cheatham*, 453 Mich at 27 (opinion by BOYLE, J.), quoting *Fare*, 442 US at 725.  In considering the voluntariness inquiry, we articulated a nonexhaustive list of factors that courts should consider in *Cipriano*, 431 Mich at 334.[4]  Those factors may also be helpful in examining the totality of the circumstances under the "knowing and intelligent" analysis.

## IV.  ANALYSIS

As noted, the principal issue here is whether Soriano's *Miranda* waiver was "knowing and intelligent," considering his exhibited confusion and exhaustion related to his LSD consumption, among other relevant factors within the totality of the circumstances.  We hold that the prosecution did not meet its burden of establishing either

---

[4] These include: (1) "the age of the accused"; (2) "his lack of education or his intelligence level"; (3) "the extent of his previous experience with the police"; (4) "the repeated and prolonged nature of the questioning"; (5) "the length of the detention of the accused before he gave the statement in question"; (6) "the lack of any advice to the accused of his constitutional rights"; (7) "whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession"; (8) "whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement"; (9) "whether the accused was deprived of food, sleep, or medical attention"; (10) "whether the accused was physically abused"; and (11) "whether the suspect was threatened with abuse." *Cipriano*, 431 Mich at 334.

Justice BERNSTEIN expresses concern that we explicitly reference the *Cipriano* factors here rather than, presumably, the shorter list of factors from *Daoud*, 462 Mich at 634.  First, we note that the lists in *Cipriano* and *Daoud* significantly overlap.  Second, *Daoud* asserts that its list is nonexhaustive and recognizes that we apply a " 'totality of the circumstances' approach" in evaluating a *Miranda* waiver.  See *id*.  And third, the *Cipriano* factors would already apply to the voluntariness inquiry.  See *Cheatham*, 453 Mich at 17 (opinion by BOYLE, J.) (noting that the voluntariness standard as applied to a *Miranda* waiver is identical to that applied to confessions).  Accordingly, we see no reason why we would not consider the totality of the relevant circumstances.

that Soriano's waiver was knowing and intelligent or that admission of the statements made under the invalid waiver was harmless error.

## A. SORIANO'S *MIRANDA* WAIVER WAS NOT KNOWING AND INTELLIGENT

A significant feature of this case is Soriano's hospitalization and erratic and confused behavior before and during the questioning by Ruggles, both of which stemmed from his known consumption of a large quantity of LSD. The Colorado Supreme Court has provided a helpful, nonexhaustive shorthand for assessing the impact of intoxication on a defendant's mental state in the context of a *Miranda* waiver:

> In considering the intoxication factor, the competence inquiry we have developed in cases involving mental incompetence or language difficulty is pertinent: whether the defendant seemed oriented to his or her surroundings and situation; whether the defendant's answers were responsive and appeared to be the product of a rational thought process; whether the defendant was able to appreciate the seriousness of his or her predicament, including the possibility of being incarcerated; whether the defendant had the foresight to attempt to deceive the police in hopes of avoiding prosecution; whether the defendant expressed remorse for his or her actions; and whether the defendant expressly stated that he or she understood their rights. [*People v Platt*, 81 P3d 1060, 1066 (Colo, 2004).]

This guidance is consistent with the analysis frequently employed by our Court of Appeals and by courts from other jurisdictions, which often consider whether the defendant appeared coherent and could hold a conversation at the time of waiver. See, e.g., *People v*

11

*Gipson*, 287 Mich App 261, 265-266; 787 NW2d 126 (2010);[5] *United States v Montgomery*, 621 F3d 568, 574 (CA 6, 2010).[6]

Courts can look to the amount of time between ingestion of intoxicating substances and the alleged waiver and whether the suspect was exhibiting erratic behavior at or around the time of the alleged waiver, information known in this case to the officer. See, e.g., *Commonwealth v Eden*, 456 Pa 1, 4; 317 A2d 255 (1974). Psychological assessments and other pertinent scientific evidence regarding the effects of intoxication generally or on the specific person at issue are also relevant. See, e.g., *id.* (considering a psychiatric report on the defendant conducted while he was in police custody and proximate to the questioning). It bears repeating that these factors are necessarily nonexhaustive given that we consider the totality of the circumstances presented in each case when assessing the validity of a *Miranda* waiver. See *Daoud*, 462 Mich at 634. The ultimate inquiry is whether the suspect's waiver of their *Miranda* rights was knowing and intelligent, i.e., whether the suspect had the mental capacity to understand their rights and the ramifications of waiving those rights when they were given the warning.

---

[5] See also, e.g., *People v Tierney*, 266 Mich App 687, 710; 703 NW2d 204 (2005); *People v Leighty*, 161 Mich App 565, 570-571; 411 NW2d 778 (1987); *People v Lumley*, 154 Mich App 618, 624; 398 NW2d 474 (1986); *People v Maliskey*, 77 Mich App 444, 450-451; 258 NW2d 512 (1977); cf. *People v Prast (On Rehearing)*, 114 Mich App 469, 483-485; 319 NW2d 627 (1982) (addressing the voluntariness of a confession).

[6] See also, e.g., *Commonwealth v Walters*, 485 Mass 271, 280-281; 149 NE3d 725 (2020); *State v Strozier*, 834 NW2d 857, 863; 2013 SD 53 (2013); *People v Jewell*, 175 P3d 103, 105-107 (Colo, 2008); *Commonwealth v Silanskas*, 433 Mass 678, 685, 686; 746 NE2d 445 (2001); *Commonwealth v Eden*, 456 Pa 1, 3-4; 317 A2d 255 (1974).

Our decision today does not call into question prior cases addressing the more common situation in which our courts have found a knowing and intelligent waiver for a suspect who was questioned in a non-hospital setting when the police had some indication that the suspect had consumed an intoxicant. Our Court of Appeals has said that voluntary "[i]ntoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive." *Gipson*, 287 Mich App at 265. This is consistent with various secondary sources addressing this topic.[7] In this sense, we break no new ground today in holding that there must be an analysis of the totality of the circumstances present at the time of the waiver. We also note that because of the impact intoxication may have on a person's mental state, "[s]pecial care must be taken in assessing a waiver . . . where there is evidence that the defendant was under the influence of alcohol or drugs." *Commonwealth v Silanskas*, 433 Mass 678, 685; 746 NE2d 445 (2001) (quotation marks and citation omitted); see also *State v Gagnon*, 139 NH 175, 178; 651 A2d 5 (1994) ("A defendant's mental and physical conditions are crucial in determining whether a knowing, intelligent, and voluntary waiver has occurred.") (quotation marks and citation omitted).

In this case, the parties agree that Soriano had taken a large amount of LSD—a drug that has hallucinogenic effects. They further agree that Soriano was suffering from severe hallucinations prior to and at the time he was taken into police custody. He was taken to

---

[7] See, e.g., 23 CJS (December 2025 update), Criminal Procedure & Rights of the Accused, § 1298 ("A waiver is not invariably invalid merely because the accused is intoxicated."); 1 Criminal Practice Manual (November 2025 update), § 28.16 ("An otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs, and this applies to the ability to waive *Miranda* rights.").

the hospital because of his drug ingestion and resultant behavior and was placed in a restraint chair at the hospital.

Ruggles read Soriano the *Miranda* warning approximately one hour after Soriano had been taken into custody and while Soriano was still in the restraint chair. The parties agree that Soriano was no longer experiencing hallucinations at that time. But the question is not whether he was still hallucinating. Rather, it is whether Soriano had the mental capacity to understand his rights and the import of waiving those rights when he was given the warning. See *Daoud*, 462 Mich at 636-637. The short period of time between Soriano's erratic behaviors and being advised of his *Miranda* rights supports the conclusion that he was not able to understand his rights at the time of waiver. See *Eden*, 456 Pa at 3-4.

More specifically, Ruggles described Soriano's affect as both "confused on why he was" at the hospital and, more generally, "confused after coming down from [the] euphoria he was experiencing." The deputy described their conversation as consisting of "a lot of yes-and-no-type answers" from Soriano without "a whole lot of dialog immediately from him." As a result, Ruggles had to "ask him specific questions" to elicit information from Soriano. For his part, as noted, Soriano testified that time was "moving at a weird pace" and that he "was kind of in [his] own world." He further testified that he did not know why he was being Mirandized, did "not really" understand the questions Ruggles was asking, and was answering the questions "randomly." After the conversation, Ruggles even advised Soriano's stepfather that Soriano was "too out of it" for a conversation to do any good. This testimony does not support the conclusion that Soriano had the ability to knowingly and intelligently waive his rights.

14

To be sure, Soriano's testimony indicates that he had some baseline understanding of his surroundings and the professional capacities of those in his vicinity. And he had some understanding that he was in trouble, as evidenced by his blurting out, "I am a rapist and I am fucked." But this does not equate with Soriano's understanding his *Miranda* rights and making a knowing and intelligent waiver of those rights. These circumstances do not satisfy many of the considerations that would indicate that he, as described by one commentator, had the ability to "exercise[] discretion" consistent with competence to understand his rights. Note, *"This Has to be Wrong": Mirandizing the Mentally Challenged*, 6 Geo JL & Pub Pol'y 629, 634-635 (2008);[8] see *Platt*, 81 P3d at 1066. Soriano provided little to the officer in the way of detail, did not attempt to deceive police or provide exculpatory information, and did nothing to show remorse or an appreciation for his situation other than the nonresponsive declaration that he was "a rapist." Moreover, Ruggles could not remember exactly what Soriano said or did to indicate that he understood

---

[8] " 'Exercising discretion,' in this context, means that the defendant acted in a way that made it clear to the officer that the defendant was capable of assessing his situation and dealing logically with the police—which would indicate that the defendant was mentally capable of taking in new information, making sense of it, and then acting appropriately on that conclusion. . . . Exhibited discretion can arguably be an excellent indication one way or another of a defendant's real waiver capabilities." *"This Has to be Wrong": Mirandizing the Mentally Challenged*, 6 Geo JL & Pub Pol'y at 634-635.

Justice BERNSTEIN suggests that our discussion of this academic literature is at odds with the *Daoud* Court's statement that our analysis "should not involve any determination whether the decision to waive those rights is actually a wise decision in terms of the defendant's self-interest." See *Daoud*, 462 Mich at 643 (emphasis omitted). In context, this discussion concerns Soriano's ability to take in and process information—namely, whether Soriano can understand the content of his *Miranda* rights when provided to him and make *a* decision; i.e., whether he has capacity to exercise discretion. We do not suggest that this includes an analysis of whether Soriano made the "right" or a "good" decision.

and waived his *Miranda* rights, and there is no other record evidence of Soriano's alleged waiver.

Soriano's demeanor stands in stark contrast to cases in which a waiver was upheld based on the detail in the defendant's statements, see, e.g., *Jewell*, 175 P 3d at 105-107; *Platt*, 81 P3d at 1063-1069; *Walters*, 485 Mass at 279, or based on the suspect's discussions of the morality and consequences of his acts with law enforcement, see, e.g., *People v Gore*, 116 Ill App 3d 780, 785; 452 NE2d 583 (1983) ("The defendant admitted that he knew that what he did was not right. He understood he could go to trial and possibly be sent to prison for what he had done."). For instance, in *Platt*, the defendant provided a "two-part written statement" that "lucidly explain[ed] in detail how he committed the sexual assault and why," that was "coherent . . . [and] rational," and that "contain[ed] a straightforward narrative." *Platt*, 81 P3d at 1067-1068. The defendant in *Platt* also asked for leniency. *Id*. at 1068. And in *Jewell*, the defendant—although drunk—provided officers with an accurate assessment of his physical condition after a car accident, followed orders, and "listened intently" to the *Miranda* warning before explicitly waiving his rights. *Jewell*, 175 P3d at 105.

Factors beyond Soriano's intoxication support our conclusion. Consideration of Soriano's " 'age . . . [and] experience' " also supports the conclusion that he did not knowingly and intelligently waive his *Miranda* rights at the time Ruggles gave him the warning. See *Daoud*, 462 Mich at 634, quoting *Fare*, 442 US at 725; see also *Cipriano*, 431 Mich at 334. Soriano was 18 years old at the time of the incident and his subsequent interrogation. While not dispositive of this inquiry, this suggests a diminished ability to process information in complex, stressful situations and therefore supports the conclusion

that his *Miranda* waiver was not knowing and intelligent.[9] We recognize that the age factor is less weighty here than it would be for a minor. Cf. *People v Stewart*, 512 Mich 472, 492; 999 NW2d 717 (2023) ("[A] defendant's age alone does not render their statements involuntary, and defendant here was likely less influenced by these characteristics than, for example, a 14-year-old."). Soriano also had not slept or eaten as a result of his hallucinogenic episode for an entire night, see *Cipriano*, 431 Mich at 334, which may have affected his state of mind.[10] Finally, the record indicates that Soriano had no prior experience with law enforcement—which suggests that he was less likely to understand his rights and how to assert them prior to receiving a *Miranda* warning. See *id*.

As noted above, the validity of a *Miranda* waiver turns on the totality of the circumstances presented to the court. *Daoud*, 462 Mich at 634. The prosecution had the burden to show that Soriano gave a valid *Miranda* waiver. *Id*. We conclude that it did not meet this burden with respect to the requirement that any waiver be "knowing and intelligent." Soriano was acting erratically and abnormally because of the effects of LSD

---

[9] One group of commentators explained that "[a]dolescents are more susceptible to stress than are adults," causing "distortion[s]" in their thinking. Goldstein et al, *Waving Good-Bye to Waiver: A Developmental Argument Against Youths' Waiver of* Miranda *Rights*, 21 NYU J Legis & Pub Pol'y 1, 26 (2018) (quotation marks and citation omitted). That is, they "may be less able to deploy their cognitive capacities as effectively as adults . . . when decisions are influenced by emotional . . . variables." *Id*. (quotation marks and citation omitted; first ellipsis in original); see also Casey et al, *Making the Sentencing Case: Psychological and Neuroscientific Evidence for Expanding the Age of Youthful Offenders*, 5 Ann Rev Criminology 321, 327-328 (2022).

[10] Law enforcement did not deprive Soriano of sleep or food. We note merely that his lack of sleep and food likely contributed to his lack of capacity to make a "knowing and intelligent" decision concerning his *Miranda* rights.

17

when he was arrested at least an hour and a half into a hallucinogenic episode. Though the hallucinations and erratic behavior had ended shortly before Ruggles gave the *Miranda* warning to Soriano, Ruggles himself observed that Soriano appeared confused, spoke only after long pauses, and could not provide detailed answers to questions. Soriano's testimony confirms his lack of understanding. Soriano's age, lack of experience with law enforcement, and lack of food and sleep contribute to the determination that he did not make a knowing and intelligent waiver. The prosecution does not provide details concerning the content of the oral waiver, and there is not a written waiver. Accordingly, the totality of the circumstances presented here does not evidence a knowing and intelligent waiver.

Justice BERNSTEIN views the facts in *Daoud* as foreclosing our decision today, and he expresses concern that we are modifying *Daoud*'s standard. However, the application of the law to the facts of the defendant's case in *Daoud* does not foreclose a different conclusion when applied to the facts of this case. In *Daoud*, the defendant had delusions that God would prevent him from being punished for the murder he confessed to. *Daoud*, 462 Mich at 628. However, the experts who testified at his trial all agreed that the defendant understood the content of the *Miranda* warnings given to him when he was interrogated. *Id*. at 641-642. This was used in the *Daoud* Court's reasoning, see *id*. at 643-644, and is, in part, how the state met its burden in that case.

Here, we hold that the prosecution did not establish that Soriano's waiver of his *Miranda* rights was knowing and intelligent by a preponderance of the evidence. We do not need to decide on the voluntariness of Soriano's *Miranda* waiver or confession; it is

18

not necessary to our decision here given our holding that the waiver was not knowing or intelligent. The alleged *Miranda* waiver is invalid.[11]

## B. ADMITTING SORIANO'S HOSPITAL STATEMENTS WAS NOT A HARMLESS ERROR

The remedy for a *Miranda* violation—here, procuring a statement from a defendant without a knowing and voluntary waiver of *Miranda* rights—is suppression of the statements at issue. See *United States v Patane*, 542 US 630, 641-642; 124 S Ct 2620; 159 L Ed 2d 667 (2004); see also *Vega v Tekoh*, 597 US 134, 152; 142 S Ct 2095; 213 L Ed 2d

---

[11] Justice BERNSTEIN would hold that Soriano's *Miranda* waiver was involuntary. We question whether his analysis adequately explains how Soriano's waiver was coerced. "[A]bsent coercion a [waiver] could not be involuntary[.]" *Cheatham*, 453 Mich at 16-17 (opinion by BOYLE, J.). "Coercion" in this context is not an abstract concept divorced from an actor under current United States Supreme Court law, however. Rather, the Supreme Court has said it requires "coercive police conduct" that occurs " 'by physical violence or other deliberate means calculated to break [the suspect's] will.' " *Colorado v Spring*, 479 US 564, 573-574; 107 S Ct 851; 93 L Ed 2d 954 (1987), quoting *Oregon v Elstad*, 470 US 298, 312; 105 S Ct 1285; 84 L Ed 2d 222 (1985); see also *Stewart*, 512 Mich at 480. The analogous cases in which the Supreme Court has found intoxication to render statements involuntary were cases of involuntary intoxication under circumstances more extreme than those here. See, e.g., *Mincey*, 437 US at 398-399 (noting that the defendant "had been seriously wounded," had been on the verge of a coma, was being housed in the intensive care unit "encumbered by tubes, needles, and breathing apparatus," and "clearly expressed his wish not to be interrogated"); *Beecher*, 408 US at 235 (explaining that the defendant had just been shot and the attending medical assistant directed the defendant to cooperate and "asked the investigators to inform him if [the defendant] did not 'tell them what they wanted to know' ").

Here, the record reflects that the restraint chair was used to protect Soriano and others given his earlier erratic behavior. We question whether there is sufficient evidence on this record that the purpose or effect of its use was to coerce Soriano. The remaining conduct described by Justice BERNSTEIN is the act of questioning Soriano given his age and intoxication. But he does not explain how the questioning of Soriano, given his age and voluntary intoxication, meets the standard of *Spring* and *Elstad*.

19

479 (2022). We also review for harmless error. MCL 769.26 provides that "[n]o judgment or verdict shall be set aside or reversed or a new trial be granted . . . on the ground of . . . the improper admission or rejection of evidence . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." See also MCR 2.613(A). Preserved, nonstructural constitutional errors, including the erroneous admission of this evidence at Soriano's trial, are subject to harmless-error review. *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000); *Neder v United States*, 527 US 1, 8; 119 S Ct 1827; 144 L Ed 2d 35 (1999). The standard for examination of harmless error depends on the nature of the error and whether the error was preserved.

Where, as here, this Court finds a preserved constitutional error that "is not a structural defect that defies harmless error analysis," we reverse unless the prosecution can "establish[] that it is harmless beyond a reasonable doubt." *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999); see also *Stewart*, 512 Mich at 501. A court should find an error harmless only after " 'a thorough examination of the record' in order to evaluate whether [the error's harmlessness] is clear . . . beyond a reasonable doubt[.]" *People v Shepherd*, 472 Mich 343, 348; 697 NW2d 144 (2005), quoting *Neder*, 527 US at 19. Courts must also " 'determine the probable effect of [the] testimony on the minds of an average jury.' " *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020), quoting *People v Kurylczyk*, 443 Mich 289, 315; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.).

The Court of Appeals in this case concluded that any *Miranda* error was harmless because "AC's testimony provides more than sufficient evidence for a reasonable jury to have found defendant guilty," since "[a] victim's testimony can be sufficient, by itself, to

20

support a criminal sexual conduct conviction." *Soriano*, unpub op at 6, citing *People v Szalma*, 487 Mich 708, 724; 790 NW2d 662 (2010). And it noted that some events occurring after the alleged assault were corroborated by the testimony of AC's mother and Ruggles.

The Court of Appeals erred in its harmless-error analysis. As we have explained, an error is not harmless "simply because [the reviewing court] concludes the jury reached the right result." *People v Mateo*, 453 Mich 203, 206; 551 NW2d 891 (1996) (concerning nonconstitutional preserved error). Moreover, even in the context of claims of ineffective assistance of counsel—where the applicable standard is more demanding than the harmless-error standard—we have emphasized that "[s]ufficient evidence to convict does not obviate the need to make a prejudice determination." *People v Dufek*, 510 Mich 957, 957-958 (2022).

To be sure, evaluating the harm caused by an "erroneous admission of evidence" involves "a comparative analysis of the likely effect of the error in light of the other evidence." *Mateo*, 453 Mich at 206. But the question is whether an "average jury 'would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony.' " *Sammons*, 505 Mich at 56, quoting *Kurylczyk*, 443 Mich at 316 (opinion by GRIFFIN, J.). Put another way, the prosecution must "prove . . . that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *People v Anderson (After Remand)*, 446 Mich 392, 406; 521 NW2d 538

21

(1994) (quotation marks and citation omitted). Accordingly, that a jury *could* convict based solely on AC's testimony is material but not conclusive to the analysis.[12]

Here, Soriano was convicted of assault with intent to commit CSC involving sexual penetration under MCL 750.520g(1). This is a "specific intent" crime which requires the defendant to possess "a particular criminal intent beyond the act done," unlike a general intent crime, which "involve[s] merely the intent to do the physical act." *People v Beaudin*, 417 Mich 570, 574; 339 NW2d 461 (1983). As explained by Justice COOLEY, "[W]hen a certain intent is a necessary element in a crime, the crime cannot have been committed when the intent did not exist." *People v Walker*, 38 Mich 156, 158 (1878). In this case, that means the prosecution was required to prove that Soriano both committed " 'an assault' " and had " 'an intent to commit criminal sexual conduct involving sexual penetration.' " *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005) (brackets omitted), quoting *People v Nickens*, 470 Mich 622, 627; 685 NW2d 657 (2004).

There are three pieces of evidence supporting the intent element. The first two are (1) Soriano's removal of his pants and underwear and (2) AC's testimony that Soriano said, before and during the assault, "we're going to do this," and "we're going to do this, right?" A jury could certainly rely on this evidence to determine Soriano's intent. See *People v Magnant*, 508 Mich 151, 179; 973 NW2d 60 (2021) (" '[M]inimal circumstantial evidence is sufficient to establish a defendant's state of mind.' "), quoting *People v Nasir*, 255 Mich

---

[12] Accord *People v Gursky*, 486 Mich 596, 620; 786 NW2d 579 (2010) (" 'The fact that the statement is cumulative, standing alone, does not automatically result in a finding of harmless error.' ") (brackets and ellipsis omitted), quoting *People v Smith*, 456 Mich 543, 555; 581 NW2d 654 (1998).

App 38, 45; 662 NW2d 29 (2003). However, these two pieces of evidence are overshadowed by Soriano's hospital-room declaration that he was "a rapist," which is the third piece of evidence. This statement is tantamount to an admission that he intended to commit a penetration offense, as required by MCL 750.520g(1). Indeed, we can think of few statements more damning in a trial involving allegations of CSC. Cf. *Anderson*, 446 Mich at 406-407. There is also evidence that the jury relied on this statement: In contrast to the CSC conviction, the jury acquitted Soriano of the charge of assault by strangulation, see MCL 750.84(1)(b), which was supported by AC's testimony but not Soriano's statement.

Soriano's hospital-room declaration, "I am a rapist and I am fucked," is both highly prejudicial to his defense and the strongest evidence that he intended to commit CSC involving penetration. And proof of this intent was required to convict Soriano under MCL 750.520g(1). See also *Starks*, 473 Mich at 234. Given the other evidence concerning Soriano's intent, the "average jury 'would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony.' " See *Sammons*, 505 Mich at 56, quoting *Kurylczyk*, 443 Mich at 315 (opinion by GRIFFIN, J.). Consequently, the prosecution has not demonstrated that the erroneous admission of the challenged statement was harmless beyond a reasonable doubt. See *Stewart*, 512 Mich at 501.

## V. CONCLUSION

Soriano's *Miranda* waiver is not valid because it was not knowing and intelligent. Soriano was no longer experiencing hallucinations at the time he received the *Miranda* warning; nevertheless, his behavior while being questioned by Ruggles, his age, his lack

23

of prior experience with law enforcement, and his exhaustion, in combination, demonstrate that he lacked the mental capacity to understand and waive his rights after they were read to him. Moreover, the improperly admitted statements were highly prejudicial in demonstrating Soriano's intent to commit a sexual penetration at the time of the assault in the context of the record from trial. Thus, the error was not harmless, and defendant is entitled to a new trial. As a result of these holdings, we do not resolve defendant's claim of ineffective assistance of counsel. See *Soriano*, ___ Mich at ___; 20 NW3d at 595. We reverse the judgment of the Court of Appeals, vacate defendant's conviction, and remand to the trial court for further proceedings consistent with our opinion.

We do not retain jurisdiction.

> Kimberly A. Thomas
> Megan K. Cavanagh
> Brian K. Zahra
> Elizabeth M. Welch
> Kyra H. Bolden
> Noah P. Hood

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 167373

ZEBEDIAH JOSEPH SORIANO,

      Defendant-Appellant.

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

I concur with the result that the majority reaches—that defendant's waiver of his rights under *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), was invalid. Accordingly, I agree with the majority that defendant's statements to the police must be excluded and his conviction vacated. However, while the majority holds that defendant's waiver was invalid because it was not knowing and intelligent, I disagree and would instead hold that defendant's waiver was invalid because it was involuntary. Accordingly, I dissent in part from the majority and write to explain why I believe that the involuntariness analysis is better suited to the circumstances here.

## I. KNOWING AND INTELLIGENT WAIVER

As the majority acknowledges, *People v Daoud*, 462 Mich 621; 614 NW2d 152 (2000), governs the knowing-and-intelligent inquiry. In *Daoud*, the defendant was advised of his *Miranda* rights three times and waived them all three times before confessing to the long-unsolved murder of his mother. *Id*. at 625-626. There was some question as to his

competency to stand trial, and following a forensic examination and a hearing on the matter, the trial court declared him incompetent. *Id*. at 627. At the defendant's request, the trial court then ordered that the defendant be examined to determine whether he had been competent to waive his *Miranda* rights. *Id*. The defendant was examined by three experts, who disagreed as to the validity of the defendant's waiver. *Id*. at 627-628. Relying on testimony from the experts that found that the defendant had been under religious delusions, the trial court found that the defendant had not made a knowing-and-intelligent waiver of his rights and thus suppressed the defendant's statements to the police. *Id*. at 628. In relevant part,

> [t]he trial court found that defendant was delusional at the time of his contact with police, in that he "believed that he had no need of any protective rights as God would be releasing him from jail as a reward for confessing to his mother's murder." The court reasoned that this delusion "prevented rational comprehension of the specific topic at issue—his right to counsel and his right against self-incrimination." [*Id*.]

This Court reversed, finding that "a basic understanding is all that is required for a knowing and intelligent waiver of *Miranda* rights." *Id*. at 644.

> In reversing, this Court acknowledged that

> a knowing and intelligent waiver of the *Miranda* rights does not require that a suspect "understand the ramifications and consequences of choosing to waive or exercise the rights that the police have properly explained to him." [*People v Cheatham*, 453 Mich 1, 28; 551 NW2d 355 (1996)]. Rather, a very basic understanding is all that is necessary for a valid waiver. [*Daoud*, 462 Mich at 642.]

This Court clarified that a knowing-and-intelligent waiver does not need to be wise or in the defendant's best interests: "Rather, the *only* inquiry with regard to a 'knowing and intelligent' waiver of *Miranda* rights is . . . whether the defendant understood 'that he did

2

not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him.' " *Id*. at 643-644, quoting *Cheatham*, 453 Mich at 29. Despite expert testimony that the defendant's delusions had prevented him from understanding how the *Miranda* rights applied to his situation, because the defendant had the base intellectual capability of understanding these rights and had an intellectual understanding of these rights, this Court held that that was sufficient for a knowing-and-intelligent waiver. *Daoud*, 462 Mich at 644.

The majority does not meaningfully engage with *Daoud*. Instead, the majority relies on analysis from an out-of-state opinion for the proposition that intoxication might play a role in determining whether a waiver was valid. The majority concludes that "[t]he short period of time between Soriano's erratic behaviors and being advised of his *Miranda* rights supports the conclusion that he was not able to understand his rights at the time of waiver." It is difficult to reconcile this holding with *Daoud*, where the defendant was found incompetent to stand trial and was under the delusion that God would reward him for confessing to murder; in *Daoud*, despite the fact that the erratic behaviors persisted throughout, this Court held that this was not itself an indication that the defendant lacked the basic ability to understand his legal rights.

The majority acknowledges that defendant had some baseline understanding of what was happening during his interrogation, but summarily concludes that this is not the equivalent of a knowing-and-intelligent waiver, based on a law student's note about the difficulty of obtaining *Miranda* waivers from the mentally challenged. There is nothing in *Daoud* that states that "exercis[ing] discretion" is the appropriate threshold for determining whether a waiver is knowing and intelligent, especially when the majority quotes a

3

definition from the note that suggests the threshold is instead the ability to exercise *sound* discretion. *Daoud* clearly states that the knowing-and-voluntary determination "should *not* involve any determination whether the decision to waive those rights is actually a wise decision in terms of the defendant's self-interest." *Daoud*, 462 Mich at 643. The adoption of an "exercising discretion" standard is contrary to the holding in *Daoud* that a baseline understanding of the *Miranda* rights is all that is required.

I thus dissent from the majority's holding that defendant's waiver was not knowing and intelligent. While I share the majority's underlying concerns about whether intoxication, especially to the extent that defendant seems to have experienced, changes the knowing-and-intelligent inquiry, instead of recognizing an exception to *Daoud* for voluntary intoxication, the majority modifies *Daoud* itself without explaining why or justifying such an expansion. I do not see how *Daoud* itself can lead to the conclusion the majority reaches in this case, given that the defendant in that case seems to have suffered an enduring break from reality that far surpasses the period of intoxication that defendant in this case suffered. Although I question whether *Daoud* oversimplifies the knowing-and-intelligent inquiry, defendant has not asked us to reconsider our holding in that case, and I would thus decline to do so, especially where I would find that defendant's waiver is invalid because it was involuntary.

## II. VOLUNTARY WAIVER

"If an individual's will was overborne or if his confession was not the product of a rational intellect and a free will, his confession is inadmissible because [it was] coerced." *Townsend v Sain*, 372 US 293, 307; 83 S Ct 745; 9 L Ed 2d 770 (1963) (quotation marks

4

and citations omitted), overruled in part on other grounds by *Keeney v Tamayo-Reyes*, 504 US 1 (1992). "The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (quotation marks and citation omitted).

In *Cipriano*, this Court outlined a nonexhaustive list of factors to consider when determining whether a statement is voluntary:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; *whether the accused was* injured, *intoxicated* or drugged, or in ill health *when he gave the statement*; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*. at 334 (emphasis added).]

This Court noted that the absence or presence of any one factor is not conclusive, and that "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id*.

In *People v Stewart*, 512 Mich 472; 999 NW2d 717 (2023), this Court considered whether an 18-year-old defendant's statements to law enforcement were voluntary. In particular, this Court considered whether the defendant's age was meaningful when assessing voluntariness. Relying in part on the brain science recognized in *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022), this Court held that because "18-year-olds are still undergoing physiological and neurological maturation, meaning that their decision-making

5

abilities are not fully developed," "these characteristics may lead an interrogee to prioritize immediate benefits over long-term consequences . . . or to comply with the authority or perceived desires of a police officer regardless of the consequences." *Stewart*, 512 Mich at 490-491. While an 18-year-old's age alone does not render their statements involuntary, "we contemplate age as a relevant circumstance to be considered as one factor in the voluntariness analysis, which is consistent with decades of established caselaw." *Id*. at 492.

Unlike the knowing-and-intelligent inquiry, whether a defendant's confession was involuntary does require that there was coercion. "Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure." *Stewart*, 512 Mich at 480, citing *Townsend*, 372 US at 307. The majority balks at coming to the conclusion that the police engaged in coercive tactics here. However, I agree with the partially dissenting opinion of the Court of Appeals that the characterization of Deputy Ruggles as friendly and helpful is disingenuous and devoid of important context; I find no issue with characterizing this conduct as coercive.

Deputy Ruggles conducted the interrogation while defendant was fully restrained in a restraint chair, which Deputy Ruggles acknowledged was because of defendant's condition: "Unpredictable behavior. Unpredictable statements. So, I guess, for his safety and everyone else's safety." When coupled with the fact that, as defendant's stepfather testified, Deputy Ruggles would later say that defendant was still "too out of it" to receive visitors, the record establishes that there was coercive police behavior. By his own account, Deputy Ruggles engaged in an interrogation of an 18-year-old defendant whose four limbs were physically restrained for everyone's safety and who Deputy Ruggles determined was

6

still unable to hold a conversation with his own parents hours after the interrogation took place.  In other words, as stated in the partially dissenting opinion of the Court of Appeals, "Deputy Ruggles was clearly well aware that [defendant] was in no condition to . . . voluntarily waive his *Miranda* rights and chose to interrogate [defendant] anyway." *People v Soriano*, unpublished per curiam opinion of the Court of Appeals, issued May 30, 2024 (Docket No. 359165), p 6 (GARRETT, J., concurring in part and dissenting in part). Taking advantage of defendant's condition certainly classifies as coercive police conduct.

An examination of the totality of the circumstances leads to the conclusion that this coercion rendered defendant's waiver involuntary[1]—defendant was sleep-deprived, as the interrogation took place in the early hours of the morning after defendant had been outside in the cold overnight; defendant was extremely intoxicated based on the amount of LSD he had taken compared to his size at the time, standing at 5'7" and weighing around 120 pounds; defendant was completely physically restrained; defendant had no prior contact with the criminal justice system; and defendant was 18 years old, which, as in *Stewart*, is meaningful because it suggests that defendant's decision-making abilities were not yet fully formed and he was thus more likely to comply with Deputy Ruggles's interrogation.

### III.  CONCLUSION

Because I otherwise agree with the majority that defendant's waiver of his *Miranda* rights was invalid and this error was not harmless, I concur in the result reached by the

---

[1] Although I agree with the majority's weighing of the relevant factors, I believe that they are more appropriately considered in the context of a voluntariness inquiry, "consistent with decades of established caselaw."  *Stewart*, 512 Mich at 492.  I question the decision to import these factors full-scale into the knowing-and-intelligent inquiry for the first time; while this may be a reasonable decision, it strikes me as both a novel and unnecessary one.

majority. However, because I would ground such a result in the involuntariness inquiry instead of grafting an intoxication exception onto *Daoud*, I dissent from the majority's knowing-and-intelligent analysis.

Richard H. Bernstein